There was sufficient evidence which would have authorized the jury to find that the plaintiff's prima facie case was rebutted and that the crash was the result of causes other than the defendant's failure to exercise proper diligence, and the court erred in directing the verdict for the plaintiff and removing these questions from the consideration of the jury.
 DECIDED DECEMBER 5, 1949.
The Insurance Company of North America, as assignor of King's School of Aviation, brought an action against Leonard V. Bailey for damages for the loss and destruction of one of the airplanes belonging to the school. The material allegations of the petition, as amended, are substantially as follows: On or about August 30, 1947, the defendant rented and hired a 415-C Model Ercoupe, N.C. 93414, from the school for the stated purpose of a round-trip flight from Columbus, Georgia, to Memphis, Tennessee. The Ercoupe was of the heavier-than-air type *Page 522 
aircraft, was powered by a gasoline engine and could not operate without gasoline, which facts were well known to the defendant. The airplane was delivered into the independent and exclusive possession of the defendant by the school on said date and remained in his independent and exclusive possession during all times herein related. At all times herein related the airplane was the lawful property of the school. The airplane was in perfect mechanical condition at the time the school delivered it to the defendant. At the time the airplane was delivered to the defendant, he was instructed as to the characteristics of the airplane, cross-country flying procedure, and the functioning of the gas tanks and fuel lines of the aircraft. The defendant was instructed to remain overnight in Memphis and was instructed not to fly the airplane at night. The defendant was not qualified by training or instruction to pilot an airplane at night, nor, in fact, had he ever piloted an aircraft at night prior to the present flight now in question. The defendant left the Municipal Airport at Columbus at about 8 a. m. and landed in Memphis at about 1:30 p. m. the same day. The defendant piloted the airplane to Memphis from Columbus and was its sole occupant. The defendant left Memphis for Columbus at about 5:30 p. m. the evening of the same day on which he had arrived, knowing full well he would be returning to Columbus during the night, in direct violation of his instructions. The defendant piloted the airplane from Memphis to Columbus and landed at the Muscogee County Airport, Columbus, at about 12:15 a. m., August 31, 1947. At that time the defendant inspected the gasoline gauges of the airplane and observed that the gauges registered low. He did not make a visual inspection of the gas tanks at that time. The defendant returned home in Columbus to spend the night and returned to the Muscogee Airport at about 8:00 a. m., August 31, 1947, for the purpose of flying the airplane across Columbus to the Municipal Airport and the school. The defendant visually inspected the gasoline tanks of the airplane and observed that there was no visible gasoline in the tanks. The defendant rocked the airplane to see if he could see any gasoline whatsoever, and, upon seeing a small amount in the tanks which collected because of the rocking of the airplane, decided to chance the flight with full knowledge of a dangerously low gasoline *Page 523 
supply. The defendant took off and at that time the gasoline supply was dangerously low and insufficient to fly said aircraft from Muscogee County Airport to Columbus Municipal Airport. While flying over the City of Columbus, the gasoline supply became exhausted and the engines suddenly quit cold and stopped, causing the defendant to turn around and make a crash landing in a nearby field, demolishing and destroying the airplane. The sole cause of the accident was a lack of gasoline, which fact was known to the defendant. The allegations of negligence are: "(a) Attempting to fly said aircraft at a time when the gasoline supply of said aircraft was exhausted. .(b) Flying said aircraft without determining whether or not the gasoline supply of said aircraft was sufficient to fly said aircraft from Muscogee County Airport to the Columbus Municipal Airport. (c) Flying said aircraft, well knowing that the gasoline supply of said aircraft was not sufficient to fly said aircraft from Muscogee Airport to Columbus Municipal Airport. (d) Flying said aircraft under circumstances, as hereinabove set forth, that he should have known that the fuel supply of said aircraft was not sufficient to fly said aircraft from Muscogee Airport to Columbus Airport. (e) Failing to use ordinary care under the circumstances hereinabove set forth."
The defendant filed his answer, the material averments of which are as follows: On or about August 30, 1947, he was taking a course in aviation training at King's School of Aviation under the terms of the GI Bill of Rights. As a part of such training, the airplane in question was delivered to the defendant for the purpose of taking a training flight from Columbus, Georgia, to Memphis, Tennessee, and return. The defendant admits that the aircraft was of the heavier-than-air type and was powered by a gasoline motor. He further admits that the airplane was in his exclusive possession from the time of its delivery to him until the time of the crash. The defendant shows that after he arrived at Memphis, and when he attempted to take off for the return trip, the motor was in such defective condition that it almost stopped running. The defendant was able to set the plane back down at the Memphis Airport without injury and he employed mechanics to repair the motor. The mechanics found what appeared to be a grass seed in the carburetor and *Page 524 
found a leaking fuel line. The exact nature of the defectiveness of the motor is not known to the defendant but is or should be known to King's School of Aviation, whose mechanics had worked on the motor from time to time and were thoroughly familiar with the condition of the motor. The repair work was done by Dixie Air Associates, Municipal Airport, Memphis, whose mechanics worked for two and one-half hours to get the motor in operating condition again. The motor had been defective several days prior to August 30, 1947, the defective condition being well known to the agents and employees of King's School of Aviation but the exact nature of said defective condition was not known to the defendant. The defendant never worked on the motor and was not permitted to do so. The motor on the plane had failed a few days prior to August 30, 1947, when the defendant and an instructor at the school were flying the plane. The plane was at that time under the control of the instructor, who was an employee of the school and said motor was being maintained by the mechanics of the school. The defendant alleges that he was already well acquainted with the characteristics of the airplane, cross-country flying procedure, and the functioning of the gas tanks and fuel lines and that he had frequently piloted aircraft at night prior to the flight in question and that he was well qualified for such flights which was well known to the plaintiff's assignor, King School of Aviation. It was his intention to return to Columbus from Memphis a very short time after arriving in Memphis, but due to the motor trouble with the airplane already mentioned, he was forced to remain in Memphis several hours longer than anticipated. He left Memphis at about 5:30 p. m. on the night of August 30 and denies that he violated any instructions of the school. He stopped en route from Memphis at Tuscaloosa and Montgomery in the State of Alabama. At Tuscaloosa the defendant had nine gallons of gasoline put in the airplane, which, with the gasoline already in the tanks, completely filled the tanks. He stopped at Montgomery after leaving Tuscaloosa, where he checked the plane, and flew to Columbus. The flight from Memphis to Columbus was without incident. The defendant alleged that the gasoline which he had put in the plane at Tuscaloosa was more than sufficient to carry the airplane to Columbus. He further shows *Page 525 
that the mechanics in Memphis found a leak in the fuel line next to the carburetor. They did not have the necessary parts, and replaced the fuel line assembly, after repairing the old parts as best they could. The defendant shows that the reason why he landed at the Muscogee County Airport instead of the Columbus Municipal Airport is that there was no personnel at the Columbus Municipal Airport at the time the defendant arrived over Columbus and, in addition, the Muscogee County Airport had a lighted field and better facilities for night landings. The defendant shows that after filling the tanks of the aircraft at Tuscaloosa, they contained approximately 23 gallons of gasoline which was sufficient for approximately five hours of normal cruising in said airplane. The defendant's flying time from Tuscaloosa to Muscogee Airport was two hours and consumed approximately ten gallons of gasoline. If the fuel mechanism on the motor had been working properly, this would have left a supply of approximately 13 gallons of gasoline when the defendant landed at the Muscogee County Airport. The distance from Muscogee County Airport to the Municipal Airport is approximately three miles and the flight between would have consumed approximately 1/6 of a gallon of gasoline, had the motor and the fuel mechanism been working properly. Before attempting to fly from Muscogee County Airport to the Municipal Airport the defendant visually inspected the overhead gasoline tank of the airplane and observed what appeared to be an ample supply of gasoline therein. The airplane had three gasoline tanks. One was placed on each wing and the third tank was placed over the motor. It was impossible for the defendant to see into either of the wing tanks. In the overhead tank the floating meter indicated about two inches of gasoline in the tank. The defendant knew that the gasoline which he had placed in the airplane in Tuscaloosa was adequate to take him not only to Columbus Municipal Airport, but approximately three hundred miles beyond. After having the motor repaired in Memphis, the defendant was informed and believed that the fuel mechanism was working properly. He had no reason to know or believe that the gasoline supply in the airplane was insufficient to take the aircraft from Muscogee Airport to the Columbus Municipal Airport. If the gasoline supply was exhausted upon inspection after the crash, *Page 526 
it was due entirely to the defective condition of the fuel lines of the airplane. After reaching an elevation of about 1300 feet, the motor suddenly stopped, and the crash followed. The defendant admitted that the airplane was delivered to him under such circumstances as to constitute him a bailee. He admits the loss and damage of the plane as the result of the crash landing; he admits the assignment of the cause of action from the school to the Insurance Company of North America; he admits the amount of the damage; and having admitted a prima facie case, demanded, upon assuming the burden, the right to open and conclude.
Upon the trial the evidence was substantially as follows:
Leonard V. Bailey, the defendant, testified as follows: "In August of 1947 I was taking a flying course at King's School of Aviation in Columbus, Georgia. In connection with this I had occasion to use a certain Ercoupe airplane. This is a low wing type monoplane, very small and light, with a split tail. In August, 1947, I had completed eighty hours of training and forty-five hours of solo flight. I had done some night flying but no solo night flying. I had flown, as well as the Ercoupe, T-Craft, a cub, and a Steerman, which is a Biplane. I had solo'd in all of the planes except the Biplane. I had flown the particular airplane involved in this case some eight times, three of which were with pilots and the remainder solo. I took my little boy up one time and my wife up one time. A day or two before taking off for Memphis I was flying with a fellow named Parker, an instructor at King's School, and we had some motor trouble at that time during a night flight. We flew to Muscogee Airport for the purpose of landing, taking off, flying around and a repeat of that procedure, and had made one landing and were taking off when the R. P. M. dropped down so low that Mr. Parker said `Let's get this thing back and set it down.' We returned the plane to King's immediately and flew for the remainder of that evening in a Taylorcraft. The occasion of my flight to Memphis was that I was taking instructions for a commercial license, and it was necessary to make certain prescribed flights across country alone and one of the prerequisites to get a commercial license. I got this plane for the purpose of going to Memphis on or about August 30, 1947, and the damage to the *Page 527 
plane or crash took place the following day, the 31st. I left at almost exactly eight o'clock in the morning and arrived in Memphis around twelve fifteen to twelve thirty. There is an hour's differential between Columbus and Memphis, but when I say twelve thirty I am talking about my own clock. It took me about four and one-half hours to fly from Columbus to Memphis with the stop. (Counsel here handed the witness a book). This is the log book which I kept. . . Looking at my log book and refreshing my recollection from it, I find that I took fifty minutes to fly from Columbus to Montgomery, an hour and five minutes to Tuscaloosa, an hour and ten minutes to Tupelo, and an hour and five minutes from Tupelo to Memphis, which would be four hours and fifteen minutes actual flying. I took off from Columbus Municipal Airport, and, when I left, my gasoline supply was full. There is a gasoline tank in both of the wings, being lower than the body of the plane, and there is a gasoline tank in the fuselage in front of the dashboard like an old model A Ford used to have. There are three tanks. Two of these hold nine gallons each, and the overhead tank five gallons. This makes an overall gasoline capacity of twenty-three gallons. From the Municipal Airport I flew to Montgomery without stopping, and from Montgomery to Tuscaloosa without stopping, and then to Tupelo, Mississippi. At Tupelo I checked the oil and filled the plane completely with gas. I don't recall how much gasoline I put in. . . I then took off from Tupelo for Memphis. My log book only shows the amount of time I was actually in the air, not the time of take-off or arrival. At Memphis I went to get something to eat and then gassed up the plane, filling up the tanks completely, purchasing the gas from two colored people that were selling the gasoline from a tank. . . I first took off from the Memphis Airport somewhere in the vicinity of one-thirty, after checking the plane completely. . . I started down the strip with full throttle, and had not gotten to the end of the runway and the plane started to cough and spit. I could not get any higher but could maintain altitude. I wiggled my wings to show I was in trouble, made a wide turn and came in on a runway which is more or less ninety degrees to the one I had taken off on. The tower saw I was in trouble and gave me a green light, which means you can land immediately. The plane *Page 528 
would taxi on the ground, but around 500 R. P. M. was as far as it would go without starting to cough up and stop. It did not actually stop, but just coughed up and spit and wouldn't go any faster, so I taxied to Dixie Air Associates, I think the name is, and they fixed the plane upon my request, but I had to wait for them to do other work, and then I recall it took around two and a half hours to fix my plane. . . I took off a second time from Memphis Airport, personally having checked my tanks again before taking off because there was a leak that they had to fix. They took off the propeller and the aluminum covering over the motor and nearly tore the whole front end of the plane to pieces, removed the carburetor, disconnected the gas line and all that. They found what looked like a grass seed, which they took out of the carburetor. There is a gas settling bowl that hangs where the gas line runs before it goes in the carburetor. This bowl and gasket around that thing had gas leaking out and dripping out of the plane. These people did not have a new gasket to put in it, but tightened it up very tight, as tight as they could, dried it off and checked it to see if it was leaking then. I personally watched this procedure, and it was not leaking at that time. They assured me it was o. k., and the gasoline tanks were all full except what it had taken to try the first take-off and landing, which was a matter of a minute or two. I did not refill a second time in Memphis. From Memphis I went in almost a direct line to Tupelo, right straight over Tupelo to Tuscaloosa. It was getting dark upon my arrival in Tuscaloosa, and I landed there for the purpose of filling up with gasoline. I did not land at Tupelo. At Tuscaloosa the people had left, except a weather station was open, and I asked the man whether or not someone could sell me gasoline. He called a fellow on the telephone, and in about an hour, more or less, the fellow came to give me some gas. . . After the plane had been filled we used a flashlight to see how much gasoline I had used so it wouldn't run over, and as a matter of fact the top tank did run over as it is up high enough so it is rather difficult to look in. Flood loaned me his flashlight so I could look at the map. There was a full moon, but it was not bright enough to sit in and read the map. I took off from Tuscaloosa about nine thirty, our time, and flew to Montgomery and landed *Page 529 
in Montgomery. . . When I got to Montgomery I wanted to fly back by the beacon lights that run between Montgomery and Auburn and on a course to Atlanta. I stopped there, therefore, and drew on the map as a matter of procedure the line from Montgomery to Auburn and took off, after I had checked the weather, for Auburn. When I got to Auburn, I landed and drew a line from Auburn to Columbus. When I took off from there I flew to the Columbus Airport, this big one with the lighted air strip, landing about five or ten minutes after twelve on the morning of the 31st of August. My only reason for landing there was not the light, as the lights that shine across the field from the road at King's School of Aviation are sufficient to land by, as there is a night club and service station there which lights the field adequately. I wanted to call my wife and tell her to pick me up as I live over on Buena Vista Road, and at night there is no telephone at King's and I knew there was somebody over at the other airport all the time. The next morning, which was Sunday, she took me back for the purpose of flying the plane from Muscogee Airport to Municipal Airport. I went early as I was O. D. that day so that I could assume my duties which were being cared for by a friend. Before I took off I personally looked in each one of the gas tanks. In the wing tanks you can't see whether or not there is gasoline unless they are full because the entrance or hole is in an up direction on the wing. It tapers up a little bit, and the gasoline drains away. There can still be gasoline in there, but it would be impossible to see it. This is not true of the overhead tank, the one that holds five gallons, as one looks right straight down into [it]. It is necessary to check this tank despite the wire sticking in a cork floating on the gasoline as it is possible for that wire to get stuck. I stood on the wing and looked in as I checked this tank and saw plenty of gasoline. This little wire float mechanism was also working. I could not say how many gallons the wire float indicated, but it was about two inches high, which is more or less one-half a tank or two and one-half gallons in the overhead tank. . . I warmed up the motors, checked the magnetos and took off. . . When I took off, the airplane seemed to behave perfectly all right. I turned and started over Columbus and got about half way when the motor cut out dead. I reached over and grabbed the *Page 530 
key, thinking the ignition had gone dead and that the key might have slipped so that it was not on. There was no cough or sput — it just died. It was too far to get to King's, so I turned back to the left, endeavoring to get into some field if I couldn't make the airport. I got over the last row of houses over the junction of Armour and Macon roads. . . In this particular case, with the motor not running, the wind made the propeller turn, causing a drag on the plane, slowing it down, and it dropped faster. I thought there would be sufficient space to get over the house and power line, but saw that I was going to hit the power line, and I pulled back and just cleared the power line enough to get over it and landed in a vacant field on the nose wheel first. . . The ground out there was soft. It must have turned the wheel a little bit, which caused the plane to turn and dip the left wing into the dirt and tore off the covering that was on the tip of the wing. I cut my head and was bleeding. I got out and thumbed a ride to King's School of Aviation and reported over there. The mileage capacity of an Ercoupe is about five miles or five gallons per hour. The actual flying time from Tuscaloosa to Muscogee Airport is exactly two hours. . . As I recall, it was around an hour or an hour and forty-five minutes after the accident when I returned to the plane. I went to the hospital with my head injury. . . The trip from Columbus to Memphis and the trip from Memphis to Columbus took me about the same actual time in the air. . . After the trouble with Parker [in a plane at night as previously referred to by the witness], and before the Memphis trip, I flew the N.C. 93414, and to my knowledge there was nothing wrong. . . When I left Columbus on this trip I had my choice of some twenty planes. . . My actual flying time [to Memphis] was about four hours exactly. I knew that the Ercoupe used around five gallons of gas per hour and found that it took nine gallons to fill it up after the trip from Memphis to Tuscaloosa, so I assume it is around four and a half to five gallons an hour. . . I filled up at the half-way mark. Tuscaloosa is exactly half way. I also landed to relax, rest and get something to eat. It was two hours of solid flying and I wanted to take a little bit of rest. . . The distance from Tuscaloosa to Montgomery is ninety-five miles. It took me exactly one hour and five minutes to make the flight. *Page 531 
My next stop was Auburn. That is fifty miles from Montgomery, more or less. That hop took me thirty-five minutes. . . Auburn looks to be about fifteen miles to the left of the straight course from Montgomery to Columbus. It is not true that I was lost and off my course when I stopped at Auburn. . . I arrived at Muscogee Airport around twelve-five or midnight. I returned the following morning and my wife brought me out. I made the same examination of the gas tank that I always make, a visual inspection, and inspected the two wing tanks by taking out the plugs. I did not see gas in either one of them. It is, of course, impossible to see gas even if there are roughly nine gallons left. I also checked the overhead tank and the oil. The overhead tank was about one-half full, two inches, more or less. It is not true that I could not see any gas in the overhead tank until I rocked the plane. . . At the time the plane crashed, the engine cut off in a dissimilar action to that when I had trouble with the motor at Memphis. At the time the motor cut off I was almost half way, near the park by Cherokee."
The witness identified a four-page statement on yellow paper, dated September 1, 1947, as the one which he made to Mr. A. H. Bailey, who wrote the statement, and which was signed by the witness, and which he read: "I, Leonard V. Bailey, white, married, age twenty-nine and reside at 2802 Buena Vista Road, Columbus, Georgia. I am Captain in the United States Army assigned to Student Training Regiment, Infantry School, Fort Benning, Georgia. I started flying about three months ago at King's School of Aviation, and now hold a private pilot's license 899299, issued July 27th, 1947. I have had about eighty-eight hours flying time, about fifty percent of which is solo time. On August 30th I rented an Ercoupe NC number 93414 from King's School of Aviation for the purpose of flying to Memphis, Tennessee, and return. I was given complete instructions by Jack King in regard to safety, caution, etc., knowing specifically — nothing specifically was said regarding night flying by Mr. King, but I know I am not qualified according to King's rules for night flying. I left the Municipal Airport, Columbus, Georgia, at 8:10 a. m. August 30th and arrived Memphis at 1:20 p. m. the same date. I made two stops on the way, a total of forty minutes. I had no trouble on my way to Memphis. I sent a *Page 532 
telegram to King's that I was leaving Memphis at 2:30 p. m. and that my arrival time would be around 7:30 p. m., Columbus, Georgia. However, when I took off at Memphis I had carburetor trouble which necessitated that I make an emergency landing for repairs. I landed and had repairs made, which consisted of a complete cleaning of the carburetor. A grass seed was in the main jet. My plane had been completely gassed up at Memphis. By the time my plane was ready to fly again it was five thirty p. m. and since I had the duty the following day I wanted to get back to Columbus the same night. I took off at 5:30 p. m. Eastern Standard Time and landed at Tuscaloosa at about 7:45 p. m. for two hours. There was no one there to give me gasoline is the reason I was there so long. I left Tuscaloosa at 9:40 (that's been changed, incidentally) and landed at Montgomery at 10:45 p. m. I stayed there ten or fifteen minutes, and then flew to Auburn, landing there about 11:20. After fifteen or twenty minutes I took off and flew to Muscogee Airport, Columbus, arriving at 12:10. When I arrived at Muscogee I noticed that the gasoline gauges registered low, but I did not look in the tank. (This is when I landed, incidentally) and landed at Montgomery at 10:45 p. m. I stayed there ten or fifteen minutes and then flew to Auburn, landing there about 11:20. After fifteen or twenty minutes, I took off and flew to Muscogee Airport, Columbus, arriving at 12:10. When I arrived at Muscogee I noticed that the gasoline gauges registered low, but I did not look in the tank. (This is when I landed, incidentally, gentlemen, coming in at night.) I went home and returned to Muscogee the following morning to fly the plane across Columbus to the Municipal Airport. I checked all the gas tanks visually and saw that there was no visible gas in the wing tank. The gauge in the center tank registered empty, but I looked into the tank, rocked the plane and saw what I considered to be an adequate supply of fuel to make the short flight over to King's. I started the engine, warmed up, taxied out to the strip, checked the mags at 1500 R. P. M. and took off headed away from Columbus (because that was into the wind). I climbed a 400 feet, turned to the left, climbed to 700 feet, cut off the — out of the pattern and turned a little more than 90 degrees to my left and headed towards King's. I continued *Page 533 
on my way to an altitude of about 1000 feet (which on that thing is a difference of about 200 feet) in King's — that would make it about 1300 feet, and, before I got over the center of Columbus, my engine quit cold. I realized that I could not glide to either airport, and a turn to my right would have landed me in the business district, and I turned to the left for straight ahead would have landed me in the residential district, and I turned 180 degrees to my left where the territory was less populated. I made it back to a little field about a mile from Muscogee County Airport. This field was grown up in weeds about a foot high, but the ground itself was soft and smooth and was right alongside a two-lane highway. My approach was directly towards a large house generally west, which was the only approach to this field. It is only about 100 feet wide. I had lost so much altitude that I would have hit this house had I not pulled the stick back and sorta hopped over it and the power line alongside. Doing this caused me to lose an air speed and resulted in a stall. I felt that it was better to land in a field and a stall rather than to crash into a house. There was no alternative. The plane hit with the nose below and buckled the front wheel landing gear. The plane turned quickly to the right, and the left wing dropped down and skidded into the dirt. When I got out of the plane it was sitting in a normal manner. I was cut about the head so I thumbed a ride to King's School to report the accident. I came back in my own car an hour after the accident. I checked the engine tank and found that it was entirely empty. (This is true. It was dead dry.) The reason for my checking the tank was to show the Lieutenant nicknamed Rocky, who went back with me, that there actually was gasoline. There was no one at Muscogee Airport to sell me gas or I would have bought some. Signed (I signed it Leonard V. Bailey, Captain Infantry)."
The witness further testified: "As to whether or not I made complaint to anybody at any time prior to the filing of this suit that there was anything mechanically wrong with the Ercoupe — I might have said that to many people, but as far as making official complaint, no. . . I saw the motor taken apart at Memphis, and there was a leak in the fuel line and they commented on it. I had charted the entire route from Columbus *Page 534 
to Memphis before I left, following the standard procedure, and it was checked by Mr. Copehaver, who was an instructor at King's School. Across the line between points I drew a check point every ten miles, at Montgomery, on my return trip. I recharted in the same way. The approximate distance from Columbus to Memphis is as follows: eighty-three miles to Montgomery; ninety-five miles from Montgomery to Tuscaloosa; ninety-seven miles from Tuscaloosa to Tupelo; eighty-eight miles from Tupelo to Memphis. The exact return distance is as follows: Montgomery to Auburn sixty miles; Auburn to Columbus thirty miles, as close as you can judge it. In normal cruising speed you fly about ninety miles an hour. . . The tickets exhibited to me indicated that I purchased a total of sixty-two gallons, which at eighteen miles per gallon would give me 1116 miles capacity against a total mileage actually traveled of approximately 720 miles. If these tickets are correct, I had sufficient gasoline to take me approximately four hundred miles further than I actually went. . . I am certain that my plane was filled with gasoline on leaving Columbus. Mr. Jack King was the only one there when I took off. I did not get off my course at any time coming back. The statement that I made to the jury is not in my handwriting. Mr. A. H. Bailey is an insurance adjuster. I watched Mr. Bailey write the times in there, but if they were lined out at the time or after I don't know. . . There was a full moon on the night I returned from Memphis. . . I did not inspect the fuel lines, so I could not say whether they were broken or not as a result of the crash landing. . . On the way back to Columbus with four stops I didn't check the leak any more because the gas seemed to be normal. It may or may not have leaked again. I can't say whether it is actually part of the fuel pump. Everything in the fuel system is connected directly or indirectly. I don't know where the actual fuel pump is. I frankly don't. . . The gas tanks were entirely full when I left Tuscaloosa. . . I don't recall filing the statement dated September, 1947, but I must have done it because here it is. It is my signature and also my handwriting in the statement. The statement is as follows: `I took off from Muscogee County Airport at 0.'40 hours to fly to King's School of Aviation. At one thousand *Page 535 
feet, seventy miles per hour, the motor cut out from lack of gas. I turned to the left to pick an open space in which to land. I was over some houses but got into a small field. In the final approach I had to pull up over a house and power line, and after clearing house and line the plane stalled and I could not gain flying speed before hitting the ground. The field was clear, but soft, and the nose wheel dug in and caused the plane to dip the left wing into the ground. I took off with an inadequate gas supply.' The last part about the gas supply I put in because I was told to. However, I believe it was sufficient. I was sitting there with a bandage around my head and I put it in. I signed it and its my handwriting. Jack King told me the plane was out of gasoline when it crashed. It was the day after the crash, as I recall. I never did know that it didn't have an adequate supply of gas because if I had I certainly wouldn't have gambled my life to fly, to save time, save money, or anything else. . . Mr. King did tell me he wanted me to make this statement to help him collect from his insurance company, to put in there that I ran out of gas so he could collect it."
A. M. Bryan testified: "I run the shop at Muscogee County Airport. I made an inspection of Ercoupe airplane involved in this case and estimated the damage done. I am familiar with the flying qualities and characteristics and also the gas tank arrangement on an Ercoupe airplane. It has two nine-gallon tanks, one in each wing, and one five-gallon fuselage tank. The fuselage tank is an overhead tank and feeds the motor by gravity. The gasoline is pumped from the wing tanks to the motor by a fuel pump. In normal operation the wing tanks would drain entirely before the gasoline supply in the overhead tank began to go down. It's fed from the wing tanks to the overhead tank, and from that to the motor. The overhead tank normally remains full until all gasoline is exhausted from the wing tanks. The fuel pump has to be working to pump gas into the overhead tank. If it were not functioning properly you would notice your gauge begin to descend, and you'd use up that five gallons and then your engine would stop. There is a fuel line leading between the two wing tanks to keep the level in both tanks even. In filling the wing tanks you would save time by filling both tanks, but you could fill both by filling one side if you had *Page 536 
sufficient time. I don't know whether the fuel lines were broken as a result of this crash landing. If they had been broken in the crash the gas would have drained out of the tanks. The general damage to the under side of the plane consisted of the nose wheel being knocked back under the center section. The center section that holds the gas tanks was completely demolished in the center part, the firewall was pushed back, and the prop and the propeller were completely gone. At normal flying speed, most Ercoupes will average 105 miles per hour. The normal gasoline consumption in normal flight is five gallons per hour and six gallons in fast cruises. I have made several checks on several different Ercoupes. As far as I could determine it, the mileage would be around twenty miles per gallon in normal flight. Headwinds, of course, slow your speed up, and tailwinds increase your air speed. If the air is stationary it would be around twenty miles. Regardless of the wind your per hour consumption would be the same. It would just cut down the speed or accelerate the speed of the plane in horizontal flight."
John J. Flood testified by deposition: "I reside at Vandegraff Field, Tuscaloosa, Alabama. . . I was employed by Dixie Air Incorporated, at Vandegraff Field on or about August 30, 1947. I recall seeing Captain Leonard V. Bailey on or about August 30, 1947. About 7:30 the CAA Communications Station called and said a ship needed gasoline. Upon arriving, I found that Captain Bailey had an Ercoupe out on the ramp and asked me if he could get gasoline. Ercoupe is a trade name. . . His plane did not have a map-reading light, so he borrowed my flashlight to read his chart and look at his compass, returning it to me a day or two later. That paper is a duplicate original we make out when we sell gasoline or other articles. It is part of the regular records kept by Dixie Air Incorporated. It reads as follows: `Dixie Air Incorporated. Salesman, Flood. Date, 8/30/47. To King School of Aviation, Columbus, Georgia. (It was paid by cash.) Quantity, 9 gallons. Description, 80 Octane. Price, 33 cents a gallon. Amount $2.97.' The ship number was NC 93414. Marked paid and initialed J. F. The number of the voucher was 9524. The amount shown on the voucher is the amount of gasoline sold to Captain Bailey. . . *Page 537 
An Ercoupe holds 23 gallons, 9 gallons in each wing tank and 5 gallons in the gravity tank. To the best of my knowledge I would say that Captain Bailey's tanks were full. I started flying in 1933 and pursued that line of business until October last year. I was chief pilot for Dixie Air at this time. We also serviced planes, that is, maintained them, such as gassing and oiling them. In 1944, Parks Air College operated the base and were distributors for Ercoupe planes, and we had the majority of service work on them in this locality. I was connected with Parks Air College during that time. Then Dixie Air took over the operation of the field in June, 1945. Based on my experience with them I would say Ercoupes have a fuel consumption averaging 4 1/2 to 5 gallons an hour. On a flight from Memphis Tennessee, to Tuscaloosa, the expected gasoline consumption of an Ercoupe should be anywhere from 9 to 10 gallons of gasoline. One mechanical failure of an Ercoupe, although not too frequent, is the fuel pump, the one that pumps gasoline from the wing tanks to the gravity feed. . . He left anywhere from 8:30 to 9 o'clock. [Leaf from Dixie Air Incorporated, marked Exhibit A. was attached to the deposition.] . . It was dark when Captain Bailey landed, around 7 or 7:30, as I had to take a flashlight to read the meter. . . I didn't check the gauge after putting the nine gallons in because the gasoline was right up to the neck, to the best of my knowledge, maybe it was running over a little bit, but I couldn't swear it ran over. . . I can't swear that I filled up the gasoline tanks of Captain Bailey's airplane. He left Tuscaloosa around 8:30 or 9. . . If his gravity feed tank gauge indicated full he could have been using gasoline solely out of his gravity feed tank. Then both wing tanks would have been empty, and I could have put nine gallons in his single wing tank."
The maps referred to by the defendant Bailey were tendered in evidence at the end of his evidence in chief.
The evidence introduced by the plaintiff is not set forth for reasons which appear in the opinion hereinafter.
Upon the conclusion of the evidence the court directed a verdict for the plaintiff. The defendant filed a motion for new trial on the usual general grounds, and by amendment added a special ground that the court erred in directing a verdict for *Page 538 
the plaintiff since there were questions of fact which should have been submitted to the jury. The court overruled the motion, and the exception here is to that judgment.
1. "There is no little confusion among the decisions in regard to the burden of proof in cases where the bailee is sued by the bailor for loss of, or injury to, the bailed goods. It seems accurate, according to the weight of authority, and also on principle, to say that, since the negligence of the bailee is a fact upon which the bailor's right to recover is based, the burden of proof as to such negligence rests at the outset on the plaintiff bailor, and remains on him all during the trial. But by proving that the goods were delivered to the bailee in good condition and that they were returned in a damaged condition or not returned at all, the plaintiff thereby makes out a prima facie case of negligence, and thus imposes upon the defendant bailee the duty of going forward with the evidence under penalty of losing the suit. Hence a mere showing of loss or injury will entitle the plaintiff bailor to recover, unless this is offset by evidence adduced by the defendant bailee. The bailee, though, may overcome the prima facie case, thus made out on the part of the bailor, by proving affirmatively that he exercised that degree of care which the bailment in question called for, or that the loss or injury was due to causes in no way connected with the lack of proper care on his part. Such a showing will then prevent a recovery by the bailor." Dobie, On Bailments and Carriers, p. 36, § 17. See also 6 C. J. 1158, § 159; Concord Variety Works v. Beckham,112 Ga. 242 (37 S.E. 392); Massillon Engine Thresher Co. v.Akerman, 110 Ga. 570 (35 S.E. 635); Hawkins v. Haynes,71 Ga. 40; Moultrie Compress Co. v. Byrom Cotton Co.,13 Ga. App. 617 (79 S.E. 589); Pickering v. Anderson, 12 Ga. App. 61
(1) (76 S.E. 754); Johnson v. Perkins, 4 Ga. App. 633
(62 S.E. 152). The defendant, in his answer, admitted that the airplane was delivered to him under such circumstances as to constitute him a bailee; that during the bailment the airplane was damaged as a result of his crash landing; that the amount of damage to the airplane during the bailment is the amount sued for; and that the claims of King's *Page 539 
School of Aviation, the bailor, had been assigned to the Insurance Company of North America, the plaintiff. These admissions on the part of the defendant constitute the admission of a prima facie case for the plaintiff, and the law, therefore, would, in the absence of anything more, presume the negligence of the defendant and grant the plaintiff's claim for damages. The defendant contends, however that the destruction of the plane did not result from running out of gas, or that if it did result from lack of gas, the exhaustion of the gas supply was the result of the defective fuel mechanism on the plane, or a leak in the fuel line, and that this was not the result of any negligence on his part, but that he exercised proper diligence under the circumstances.
As has been said innumerable times by this court and the Supreme Court, except in clear, plain, and palpable cases, the questions of negligence and diligence are always for the determination of the jury. Thus, in determining whether or not a verdict was demanded for the plaintiff, it is necessary to decide whether or not there was any evidence from which the jury might deduce or infer that the plaintiff's prima facie case (and the consequent presumption of negligence) had been rebutted by the defendant. We think that there was. While it is true that there was evidence that there had been motor trouble of some kind in the plane two days before the defendant flew it to Memphis and that in Memphis he had to have what looked like a grass seed removed from the settling bowl of the carburetor, and there had been a leak in the fuel system caused by a defective gasket, which had been remedied by tightening, we can not say as a matter of law that the defendant was negligent in attempting to fly the plane under these circumstances. Further, even though he did make the affidavit that the crash was caused because the plane ran out of gas, he gave an explanation, which the jury could have believed if they so chose; and even though the jury could have believed that when he rocked the plane and saw gasoline which he considered sufficient to operate the plane between the Muscogee County Airport and the Columbus Municipal Airport, the jury could have found that he was merely guessing, that he was not sure of the amount of gas present and that he was taking a risk in not being positive of the quantity of gas in *Page 540 
the tanks which was not in accord with the diligence required, we as judges may not make such a decision, for the jury could just as reasonably have said that the defendant knew that he had filled the tanks in Tuscaloosa with a quantity of gasoline sufficient to carry the plane 200 miles beyond Muscogee County Airport and Columbus Municipal Airport and that it was not even necessary to look into the tanks or check the actual quantity present before taking off. While we ourselves would not subject ourselves to such a risk, and were we serving on the jury we would not have thought it in the exercise of ordinary care to take such a risk, we cannot as judges make that determination and thereby usurp the prerogative of the jury. While there are doubtless numerous theories which could be put forth for and against the question of the defendant's exercise of ordinary care, it serves no purpose here to delve into a multitude of such theories; we will add only one more to what we have already said and desist. The jury quite reasonably could have found that in view of the quantity of gasoline placed in the plane in Tuscaloosa — only a short distance from Columbus — and in view of the quantity that would necessarily have remained in the plane after so short a flight, that it must have been some defect in the plane which proximately caused the crash. We think the court erred in directing the verdict and taking the questions of negligence and diligence from the consideration of the jury.
We, of course, do not intimate any opinion as to what the jury's verdict should be. They could under this evidence have found for the plaintiff or they could have found for the defendant.
The court erred in directing a verdict for the plaintiff and in overruling the motion for a new trial.
Judgment reversed. Gardner and Townsend, JJ., concur.